# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

BERNADETTE BAUTISTA and
ANIUWOLF NOHELY BAUTISTA,

    Plaintiffs,

v.                                                                               Civ. No. 25-775 GBW/KRS

CITY OF RUIDOSO DOWNS, *et al.*,

    Defendants.

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on Defendants' Motion to Dismiss. *Doc. 4*. Having reviewed the briefing and relevant law, the Court will grant the motion for the reasons stated below.

**I.    BACKGROUND**

Plaintiffs filed this action in the Twelfth Judicial District Court on June 14, 2025.[1] *Doc. 1-1*. The case was removed on August 13, 2025. *Doc. 1*. The complaint alleges as follows. Plaintiffs Bernadette Bautista and Aniuwolf Nohely Bautista[2] live in their

---

[1] The complaint inaccurately alleges that a First Amended Complaint "was filed in this matter" on March 24, 2024. *Doc. 1-1* at ¶ 64. A First Amended Complaint *was* filed by Plaintiffs on March 24, 2024, but it was filed in Case No. D-1226-CV-2024-00057, subsequently removed to this District as Civ. No. 24-344 GBW/DLM. *See* Civ. No. 24-344 GBW/DLM at *doc. 1-1*. The case was voluntarily dismissed on May 8, 2024.

[2] The complaint alleges that "Bautista lives at 112 River Lane," without specifying which Plaintiff this refers to, *doc. 1-1* at ¶ 28, and "Plaintiff Bautista" is used throughout the allegations without distinction. However, the complaint also alleges that "Plaintiffs have lived with sewage in their home

home at 112 River Lane, Ruidoso Downs, NM. *Doc. 1-1* at ¶ 28. The Ruidoso River runs on the north side of the home. *Id*. at ¶ 46. The home was constructed in 1978 and never had any electrical, plumbing, or structural issues, or unusual utility bills, until January 2021. *Id*. at ¶¶ 29–30. On or about January 25, 2021, Defendant City of Ruidoso Downs ("City") began work on the sewage lines involving the use of a "jetter" to force extremely high amounts of pressure into the lines. *Id*. at ¶¶ 38–39. The work was done by contractor Defendant SAK Construction over the course of some weeks. *Id*. at ¶¶ 36, 39. As a result, on or about January 26, 2021, Plaintiffs' toilets began to "erupt" and overflow with sewage, backing up into the home and damaging tile, carpets, walls and property. *Id*. at ¶ 34. The pressure against Plaintiffs' plumbing lines was great enough to blow the cap off of a "cleanout" pipe located in Plaintiffs' front yard. *Id*. Within the next day or two, a sewage pool of standing water appeared in Plaintiffs' yard. *Id*. At the same time, two of Plaintiffs' neighbors also had their toilets "erupt" and required significant work on their plumbing lines. *Id*. at ¶ 40.

On October 12, 2021, Bernadette went into the City office to pay her $1,700 water bill. *Id*. at ¶ 44. She spoke with Defendant Alejandra Giron, a city employee. *Id*. at ¶¶ 44, 13. Giron asked her address and when Berandette told her it was 112 River Lane, Giron said, "Oh, I thought you'd be in here sooner." *Id*. at ¶ 44. In late October 2021,

---

and in their property" and "have had their house, the Home, economically ruined." *Id*. at ¶ 62. The Court therefore infers that both Plaintiffs live at the address.

2

Bernadette "bumped into" Defendant Judy Miller, a City Council Member. *Id*. at ¶¶ 9, 45. Bernadette explained the situation with her home, including the "standing water" in the front yard, and how "the work done by SAK had damaged the house." *Id*. at ¶ 45.

In late March 2022, Plaintiffs consulted a plumber about their sewage problems. He advised that the cause was "work done to the lines" by the City of Ruidoso Downs. *Id*. at ¶ 35. In or around March 2022, a contractor told Bernadette that the damage to the house was too extensive to be fixed, and that it would need to be demolished and rebuilt. *Id*. at ¶ 60.

In January 2023, Plaintiffs took water samples from their front yard and from the Ruidoso River. *Id*. at ¶ 46. The Diagnostic & Technology Center, Inc., located in Alamogordo, NM, concluded that the sewage water pooling in the front yard of the home was also found in the Ruidoso River and that the "levels of contamination were very high." *Id*. at ¶ 49.

On May 8, 2023, Plaintiffs' toilets started "bubbling" again and on June 4, 2023, they "erupted" and overflowed, causing more damage. *Id*. at ¶ 53. This event occurred at the same time the City did work on the fire hydrants in Ruidoso Downs. *Id*. Plaintiffs allege the additional damage was "caused by either the original (January, 2021) work on the cities' . . . plumbing lines, or new work done by the Defendant City." *Id*. at ¶ 54. To the present day, Plaintiffs' toilets continue either to "bubble up" or not to

function at all. *Id*. at ¶ 62. The toilet problems increase on weekends when there are tourists in town. *Id*. Likewise, the standing water increases in size on weekends and during the racetrack season in Ruidoso Downs. *Id*. at ¶ 47.

Plaintiffs assert claims under the Clean Water Act (CWA), § 1983, the New Mexico Tort Claims Act (NMTCA), the New Mexico Civil Rights Act (NMCRA), and the Inspection of Public Records Act (IPRA). They also assert a common law claim of bad faith insurance practices against Defendant Crawford.

## II. LEGAL STANDARD

To survive a motion to dismiss, the complaint "must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Leverington v. City of Colorado Springs*, 643 F.3d 719, 723 (10th Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). This standard does not require "detailed factual allegations," but it does require more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). When ruling on a 12(b)(6) motion, the court must "assume the truth of all well-pleaded facts in the complaint, and draw all reasonable inferences therefrom in the light most favorable to the plaintiffs." *Leverington*, 643 F.3d at 723 (quoting *Dias v. City & Cnty. Of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009)). The court need not accept the truth of any legal conclusions. *Iqbal*, 556 U.S. at 678.

The plausibility standard "does not impose a probability requirement." *Twombly*, 550 U.S. at 556. Rather, "a well-pleaded complaint may proceed even if it appears 'that a recovery is very remote and unlikely.'" *Id.* at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). The complaint must only be "enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555. However, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). In other words, the well-pleaded facts must "permit the court to infer more than the mere possibility of misconduct." *Id.* at 679.

**III.   ANALYSIS**

Defendants move for the dismissal of all claims. *Doc. 15*. In the response, Plaintiffs agree to dismiss the IPRA claim and the claim for bad faith insurance practices. *Doc. 12* at 17. In addition, Plaintiffs concede that they failed to include necessary allegations in their civil conspiracy claim but ask for leave to amend. *Id.* at 15.

    A.    <u>NMTCA and NMCRA Claims</u>

Defendants argue that the Fifth and Sixth claims for relief, *doc. 1-1* at ¶¶ 85–99, which assert claims against Defendant City of Ruidoso Downs under the NMTCA and NMCRA, should be dismissed because they are time-barred, improperly exhausted, and fail to state a claim. *Doc. 4* at 4–7.

The first matter to be determined is the applicable limitations period.  Plaintiffs argue that the four-year limitations period of NMSA § 37-1-4, which covers, inter alia, claims "brought for injuries to property," applies to their NMTCA and NMCRA claims.  The Court disagrees.  The NMTCA contains its own statute of limitations and provides that "[a]ctions against a governmental entity or a public employee for torts shall be forever barred, unless such action is commenced within two years after the date of occurrence resulting in loss, injury or death."  NMSA § 41-4-15(A).  The NMTCA's specific limitations period applies to all torts by governmental entities regardless of the type of injury.  *See Yurcic v. City of Gallup*, 298 P.3d 500, 503 (N.M. Ct. App. 2013) (concluding as a matter of law that the two-year limitations period of § 41-4-15(A), not the four-year limitations period of § 37-1-4, applied to claims for "injuries to property" against the city).  The NMCRA likewise contains its own limitations period: "A claim made pursuant to the New Mexico Civil Rights Act shall be commenced no later than three years from the date a claim can be brought[.]"  NMSA § 41-4A-7.  Therefore, the applicable statute of limitations is two years for the NMTCA claims and three years for the NMCRA claims.  Claims under the NMTCA arising before June 14, 2023, and claims under the NMCRA arising before June 14, 2022, are untimely.

Defendants assert that Plaintiffs' claims are time-barred because they are based on work performed on or about January 25, 2021.  Plaintiffs argue that the continuing injury to their property extends the statute of limitations "to the present."  *Doc. 12* at 6.

6

They cite *Valdez v. Mt. Bell Tel. Co.*, 755 P.2d 80, 84 (N.M. Ct. App. 1988), where the plaintiff was allowed to bring successive actions for injuries caused by a negligently maintained utility pole that caused intermittent water seepage. In 1972 or 1973, the plaintiff noticed that the land on the south side of his home was constantly damp. *Id.* at 82. In 1979 or 1980, the plaintiff noticed cracks in the south wall of his home. *Id.* He hired professionals to repair the cracks, but they subsequently returned between 1982 and 1985, increasing in size and extending to new areas, and the south side of the house began sinking. *Id.* The court applied the following rule to determine when the plaintiff's claims accrued:

> Whenever the nuisance is of permanent character, and its construction and continuance are necessarily an injury, the damage is original, and may be at once fully compensated. In such case the statute of limitations begins to run upon the construction of the nuisance. But when such structure is permanent in its character, and its construction and continuance are not necessarily injurious, but may or may not be so, the injury to be compensated in a suit is only the damage which has happened, and there may be as many successive recoveries as there are successive injuries. In such case the statute of limitations begins to run from the happening of the injury complained of.

*Id.* at 84 (quoting *St. Louis, I.M. & S. Ry. v. Biggs*, 12 S.W. 331, 331 (1889)). The court reasoned that the utility pole was a temporary nuisance because it was "not per se injurious, but becomes so with excessive rain or snow." *Id.* Accordingly, it held:

> [T]he appropriate rule is that successive recoveries should be allowed following each injury, where the improvement is negligently constructed and the damage to plaintiff's property could not be reasonably calculated at the time of the completion of the construction thereof.

7

*Id*. Because the nuisance was "abatable" and "not necessarily injurious," the injuries were "recurring," and the extent of the damages was "not necessarily ascertainable when plaintiff purchased the property," a separate cause of action accrued with each new injury to the plaintiff's property. *Id*.

In *Yurcic*, 298 P.3d at 502, the *Valdez* rule was applied where a neighboring retention pond repeatedly overflowed and caused damage to the plaintiff's building. The court held summary judgment was improper because the defendant had failed to establish, inter alia, "whether the damages caused by the seepage on Plaintiff's property could have been ascertainable when the pond was built." *Id*. at 508. The court found the continuing wrong theory likely applied because "[t]he injury was gradual and incremental, not immediate"; in other words, "the tortious act did not "result[] in immediate and direct injury." *Id*. at 509 (quoting *Wilson v. Giesen*, 956 F.2d 738, 743 (7th Cir. 1992)).

The present case is distinguishable. The damage to Plaintiffs' property was ascertainable within days of January 25, 2021, when the "jetter" was used on the sewage lines. *Doc. 1-1*. at ¶¶ 34, 38–39; *c.f. Valdez*, 755 P.2d at 84. At that time, the toilets "erupted" and the sewage pool appeared in Plaintiffs' front yard. *Doc. 1-1* at ¶ 34. To be sure, Plaintiffs allege that their toilets have continued to malfunction and that the standing water remains in their yard to this day. *Id*. at ¶ 62. They also allege that the problems intensify when there are tourists in town. *Id*. at ¶¶ 47, 62. But these are

8

merely ill effects resulting from the original damage.  They do not allege that their injuries arise from any continuing conduct by the City, or from a structure that the City has continuously or intermittently failed to maintain.  *C.f. Valdez*, 755 P.2d at 84; *McNeill v. Rice Eng'g & Operating Inc.*, 128 P.3d 476, 483 (N.M. Ct. App. 2005) (a continuing nuisance involves "ongoing tortious conduct," not a "completed tortious act with . . . [no] further activity by the tortfeasor" (quoting *Haas v. Sunset Ramblers Motorcycle Club, Inc.*, 726 N.E.2d 612, 613–14 (Ohio Ct. App. 1999))).  Rather, they allege that when Defendants negligently employed the "jetter" on January 25, 2021, the resulting pressure caused immediate and apparent damage to Plaintiffs' pipes and plumbing.  Nothing in the complaint suggests the resulting damage is "abatable" by the City, *c.f. Valdez*, 755 P.2d at 84, because the tortious action—i.e., the work on the lines—has already ceased and the harm is repairable only by fixing the original damage to Plaintiffs' plumbing and lateral sewer line.  Moreover, Plaintiffs allege and acknowledge in the briefing that they were aware by March 2022[3] that the City's work on the sewage line caused the damage.  *Doc. 1-1* at ¶ 35; *doc. 12* at 6.  By that time, the damage to the house was already so extensive that they were advised it needed to be demolished.  *Doc. 1-1* at ¶ 60.  Because this suit was filed on June 14, 2025, the Court

---

[3] In fact, the complaint alleges that in October 2021, when Bernadette "bumped into" Defendant Judy Miller, she told Miller than "the work done by SAK had damaged the house."  *Doc. 1-1* at ¶ 45.  It therefore appears Plaintiffs were aware of the cause of their sewage problems prior to March 2022.  But in any event, the claims are untimely whether they accrued in October 2021 or March 2022.

finds that Plaintiffs' claims under the NMTCA and NMCRA are outside the statute of limitations and must be dismissed.[4]

### B. Civil Conspiracy

Defendants move to dismiss Plaintiffs' claim for civil conspiracy under 42 U.S.C. § 1983 on the basis of qualified immunity and failure to state a claim. *Doc. 4* at 7–11. Plaintiffs concede in the response brief that the complaint fails to state a claim for civil conspiracy because it does not include relevant factual allegations. *Doc. 12* at 15. Plaintiffs seek leave to file an amended complaint and present several alleged facts that would be included therein. *Id*. at 15–16. However, Defendants correctly note that no proposed amendment has been submitted to the Court. *See* D.N.M. LR-Civ. 15.1. The Court declines to rule preemptively on the merits of a theoretical pleading. Plaintiffs will be granted an opportunity to file a motion to amend in compliance with the applicable rules, at which time the Court will assess whether the proposed amendment is futile or should otherwise be denied.

---

[4] The Court notes that Plaintiffs allege their toilets "bubbl[ed]" and "erupted" again in May and June of 2023, respectively, and that this was caused "either" by the work in January 2021, or by the City's work on the fire hydrants in 2023. *Doc. 1-1* at ¶¶ 53–54. However, there is no allegation that the work on the fire hydrants was performed negligently, nor is it stated as a basis for Plaintiffs' claims under the NMTCA or NMCRA. *See id.* at ¶¶ 85–99. The Court therefore does not consider the work performed in 2023 for purposes of the statutes of limitations.

C. <u>Clean Water Act</u>

Plaintiffs' first, second and third claims for relief[5] are brought under the CWA. The CWA prohibits "the discharge of any pollutant by any person" except as authorized by permit under the National Pollutant Discharge Elimination System (NPDES). 33 U.S.C. § 1311(a); *Sierra Club v. El Paso Gold Mines*, 421 F.3d 1133, 1135 (10th Cir. 2005). "'Discharge of a pollutant' means 'any addition of any pollutant to navigable waters from any point source.'" *Stone v. High Mt. Mining Co., LLC*, 89 F.4th 1246, 1252 (10th Cir. 2024) (quoting 33 U.S.C. §§ 1311(a), 1362(12)). A "point source" is "any discernible, confined, and discrete conveyance," including "any pipe." 33 U.S.C. § 1362(14). The definition of "pollutant" specifically includes "sewage." *Id.* § 1362(6). "To prove a violation of the CWA, a plaintiff must show that a defendant: (1) discharged (2) a pollutant (3) into navigable waters (4) from a point source (5) without an NPDES permit." *Stone*, 89 F.4th at 1252 (citing *Sierra Club*, 421 F.3d at 1142; 33 U.S.C. §§ 1311(a), 1342(a)(1)). The CWA "establishes strict liability: an unpermitted discharge constitutes a violation regardless of fault." *Id.* (citing 33 U.S.C. §§ 1319(d), 1311(a)).

Plaintiffs bring their claims under the CWA's citizen suit provision, which allows "any citizen" to commence a civil action on his own behalf against a person or

---

[5] The distinction among these three claims is somewhat unclear. All appear to assert citizen suits for violation of the CWA based on Defendants' use of the "jetter" on the sewage lines, which damaged Plaintiffs' plumbing and caused the ongoing, unpermitted seepage of pollutants into the Ruidoso River. At any rate, the Court's analysis applies to all of Plaintiffs' CWA claims.

11

governmental entity alleged to be in violation of an effluent standard or limitation. 33 USC § 1365(a)(1). They allege that Defendants negligently caused damage to Plaintiffs' home plumbing, which in turn caused "sewage seepage" into the Ruidoso River, and that Defendants did not obtain a NPDES permit for the discharge. *See doc. 1-1* at ¶¶ 66–77. Defendants argue the claims should be dismissed because Plaintiffs, not Defendants, own the point source that continues to discharge pollutants into the Ruidoso River. *Doc. 4* at 13–16. Plaintiffs contend that non-owners can also be responsible under the CWA, citing statutory language that prohibits "the discharge of *any* pollutant by *any* person." *Doc. 12* at 19 (quoting 33 U.S.C. § 1311(a) (emphasis added)). The viability of Plaintiffs' CWA claims turns on this disagreement.

In *Sierra Club*, cited by Defendants, the Tenth Circuit held that the owner of an abandoned mine shaft was responsible for the discharge of pollutants even though they were not actively mining the property, and had not acted in any way to cause the discharge. *Sierra Club*, 421 F.3d at 1145–46. The court held that "the liability and permitting sections of the Act focus on the point of discharge, not the underlying conduct that led to the discharge." *Id*. at 1143. Accordingly, "point source owners . . . can be liable for the discharge of pollutants occurring on their land, whether or not they acted in some way to cause the discharge." *Id*. at 1145. As the court put it, under the CWA, "if you own the leaky 'faucet,' you are responsible for its 'drips.'" *Id*. Defendants cite *Sierra Club* for the proposition that the "owner or operator" of a point

source is liable for the discharge, regardless of fault. While true, the inquiry does not end there. Because there are no pending claims against Plaintiffs, the question is not whether the owner of a point source is liable under the CWA, but whether a third party may *also* be liable.

Plaintiffs contend that it may. They concede that their counsel "could not find anything from SCOTUS or the Tenth Circuit directly illustrating a 'third person' 'non-owner' being held liable for violating the CWA," *doc. 12* at 19–20, but refer the Court to an out-of-circuit criminal case, *United States v. Hanousek*, 176 F.3d 1116 (9th Cir. 1999). Hanousek was prosecuted under § 309 of the CWA, which imposes criminal penalties for any person who "negligently" or "knowingly" violates the CWA. *See* 33 U.S.C. § 1319(c). He was employed by a railway company to supervise a rock-quarrying project alongside a railroad track. *Hanousek*, 176 F.3d at 1119. A high-pressure petroleum products pipeline, owned by the employer's sister company, ran parallel to the railroad within a few feet of the tracks. *Id*. A backhoe operator punctured the pipeline and discharged at least a thousand gallons of oil into the adjacent river. *Id*. Hanousek was charged under 33 U.S.C. § 1319(c)(1)(A) with negligently discharging a harmful quantity of oil into a navigable water of the United States. *Id*. Plaintiffs contend that Hanousek was a "third party" in the same sense as the Defendants in this case, because he did not own the high-pressure pipeline but was nonetheless held responsible under the CWA. *Doc. 12* at 21. Therefore, they argue, Defendants may also be liable.

13

The Court finds *Hanousek* is distinguishable in two important ways.  First, the enforcement mechanism of § 1319(c) differs fundamentally from the citizen suit provision of § 1365.  The statutory emphasis on a present and continuing violation—rather than its underlying cause, or the defendant's past conduct—is unique to § 1365.  Specifically, the present-tense language of § 1365 ("alleged to be in violation") requires that the citizen-plaintiff "allege a state of either continuous or intermittent violation." *Gwaltney of Smithfield v. Chesapeake Bay Found.*, 484 U.S. 49, 57 (1987).  This requirement does not apply to government enforcement actions under § 1319.[6]  *See id*. at 59 (holding that "citizens, unlike the Administrator, may seek civil penalties only in a suit brought to enjoin or otherwise abate an ongoing violation"); *United States Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598–99 (2016) ("[A]lthough the property owner may still face a citizen suit under the Act, such a suit—unlike actions brought by the Government—cannot impose civil liability for wholly past violations." (citing §§ 1319(d), 1365(a); *Gwaltney*, 484 U. S. at 58–59)).  Although *Gwaltney* contrasted § 1365 with § 1319(d), which establishes civil enforcement actions, the same reasoning applies to § 1319(c).  *See United States v. Dilworth*, 2000 U.S. Dist. LEXIS 14050, at *6 (D. Or. Sept. 14, 2000) ("There is no requirement under 33 U.S.C. § 1319(c)(2)(A) that the government must

---

[6] Excepted from this general rule are government actions for injunctive relief under § 1319(a).  *See Gwaltney*, 484 U.S. at 58 (observing that § 1319(a) uses the present-tense phrase "is in violation").  But this exception does not affect other enforcement mechanisms under § 1319, in contrast to citizen suits under § 1365.  *See id*. ("The citizen suit provision suggests a connection between injunctive relief and civil penalties that is noticeably absent from the provision authorizing agency enforcement.").

14

prove a continuing violation."). Indeed, the sentencing enhancement for "ongoing, continuous, or repetitive discharge" under U.S.S.G. § 2Q1.3(b)(1)(A) would be absurd if it were a required element of the offense. *See, e.g., United States v. Ortiz*, 427 F.3d 1278, 1285–86 (10th Cir. 2005) (applying the enhancement to convictions under §§ 1319(c)(2)(A) and 1319(c)(1)(A)). In short, it does not necessarily follow that liability under § 1319 translates to liability under § 1365—particularly where, as here, the defendants have no present ownership or control of the polluting point source. Conversely, the no-fault rule of *Sierra Club* cannot apply to criminal actions because criminal liability requires at least a "negligent" discharge. 33 U.S.C. § 1319(c); *Ortiz*, 427 F.3d at 1282–83.

Second, as Defendants point out, the facts of *Hanousek* differ significantly from the case at bar. While neither Hanousek nor his employer owned the ruptured pipeline, the pipeline ran through the jobsite and it was Hanousek's responsibility to ensure it was protected as his subordinates drove over it. *See Hanousek*, 176 F.3d at 1119 ("To protect the pipeline during the project, a work platform of sand and gravel was constructed on which the backhoe operated to load rocks over the pipeline and into railroad cars . . . [and the previous contractor] covered an approximately 300-foot section of the pipeline with railroad ties, sand, and ballast material to protect the pipeline, as was customary."); *Ortiz*, 427 F.3d at 1283 (discussing *Hanousek* and describing how he "failed to cover an oil pipeline near the project site with protective

materials"). In short, Hanousek exercised significant, direct control over the pipeline in the course of his work on the railroad. He might therefore reasonably be described as an operator—though not an owner[7]—of the high-pressure pipeline and the surrounding area. *See San Francisco Herring Ass'n v. Pac. Gas & Elec. Co.*, 81 F. Supp. 3d 847, 862 (N.D. Cal. 2015) (denying motion to dismiss where "defendants had control over the [point source], such that they would have been able to comply with a court order that required them to cease the allegedly unlawful activities"); *Comm. to Save Mokelumne River v. East Bay Mun. Util. Dist.*, 1993 U.S. Dist. LEXIS 8364, at *40 (E.D. Cal. Mar. 3, 1993) (finding CWA violation where defendant had "intimate relationship with, and control over, the facility and its discharges"); *c.f. Friends of Sakonnet v. Dutra*, 738 F. Supp. 623, 633 (D.R.I. 1990) (finding no violation redressable by § 1365 where defendants had "no control over the pollution source"). Operators of point sources are liable as well as owners. *See* 40 C.F.R. § 122.21(b) ("When a facility or activity is owned by one person but is operated by another person, it is the operator's duty to obtain a permit."). Here, there is no allegation that Defendants owned, operated, or otherwise exercised control or authority over the polluting point source—i.e., the ruptured pipe in Plaintiffs' front yard and any other contributing leak in Plaintiffs' plumbing. The City's municipal code states that

---

[7] Defendants also note that the pipeline in *Hanousek* was owned by the railway's sister company, whereas Plaintiffs' pipes are not owned by the City or any affiliated person or entity. *See doc. 15* at 14–15. However, it is unclear to what extent—if any—the sister company's ownership was attributable to Hanousek's employer.

lateral sewer lines are not owned or controlled by the City.  *See* City of Ruidoso Downs Code of Ordinances, Title V, § 51.01 (available at https://www.ruidosodowns.us/departments/city_of_ruidoso_downs_code_of_ordinances.php) ("Public Sewer: A sanitary sewer that is controlled and/or owned by the City.  This is restricted to the main sewer line, whereas the property owner is responsible for the lateral sewer line and its connection to the public sewer.").  The complaint does not allege that any pollutants are leaking into the Ruidoso River from a main sewer line.[8]  Accordingly, the Court is not persuaded that *Hanousek* supports Plaintiffs' case.

The question remains whether a third party may be liable, in a CWA citizen suit, for causing damage to someone else's point source.  Although neither the parties nor the undersigned have located a case directly on point, the Court has carefully reviewed cases under the CWA that relate to original causation and current ownership.  The Fourth Circuit's decision in *W. Va. Highlands Conservancy, Inc. v. Huffman*, 625 F.3d 159, 167 (4th Cir. 2010), underscores the irrelevance of causation and suggests that *only* current owners and operators can be liable.  The court held a state agency was required to obtain a NPDES permit for pollution at a forfeited mining site, even though the agency had played no part in causing the pollution and, in fact, was involved in

---

[8] In the response brief, Plaintiffs assert without citation that "[i]t is well within Defendants [sic] ability to simply come in and fix Plaintiffs' broken lateral sewer lines." *Doc. 12* at 3.  This is contrary to the ordinance quoted above and unsupported by the allegations of the complaint, which state that Plaintiffs own the defective pipes and plumbing.

reclamation efforts. *Id.* at 166. The court reasoned that "there is simply no causation requirement in the statute . . . 33 U.S.C. § 1311(a) bans 'the discharge of any pollutant by any person' regardless of whether that 'person' was the root cause or merely the current superintendent of the discharge." *Id.* at 167. Accordingly, "it is the current operator of a mine site, *rather than* the initial owner, who must obtain a permit." *Id.* (emphasis added). The court considered *Sierra Club* and several other cases, concluding: "Together, [these cases] make clear that under the CWA, the question of who generated pollutants is irrelevant. What matters is who is *currently discharging pollutants* into navigable waters." *Id.* at 168 (emphasis added).

Likewise, a number of district courts have determined that "a wholly past owner or operator can have no liability for . . . current violations." *Conservation Law Found., Inc. v. Shell Oil Co.*, 628 F. Supp. 3d 416, 438 (D. Conn. 2022) (quoting *Black Warrior Riverkeeper, Inc. v. Birmingham Airport Auth.*, 2008 U.S. Dist. LEXIS 129602, at *4–5 (N.D. Ala. Mar. 3, 2008)) (collecting cases); *e.g., Dutra,* 738 F. Supp. at 632 ("[A] person who has violated the Clean Water Act may avoid liability by relinquishing ownership of the polluting source although the violation continues."). Extending the logic of *Gwaltney* for excluding wholly past violations from citizen suits, courts have reasoned that § 1365(a) is directed at "a present violation by the *person* against whom the citizen suit is brought" and that the notice requirement would serve little purpose in a suit against

past owners, who have no opportunity to bring themselves into compliance. *Dutra*, 738 F. Supp. at 632–33 (emphasis added) (citing *Gwaltney*, 484 U.S. at 60).

Of course, Defendants are not past owners or operators of Plaintiffs' pipes. But the Court finds these past-owner cases instructive because of their logical parallels to Plaintiffs' third-party theory of liability. The rule of *Sierra Club* and *Huffman* is that the present owner or operator of a point source is liable for a discharge under the CWA, regardless of their role in causing the pollution. Expanding on this principle, courts have persuasively reasoned that past owners or operators are not liable under § 1365 even if they acted negligently or knowingly to cause the discharge.

If the owner of a point source can avoid suit under § 1365 by selling the property—regardless of their fault or role in causing the discharge—then it is difficult to imagine how a third party could remain indefinitely liable for causing a discharge on someone else's property. Tenth Circuit case law is quite clear that "liability turns on the "point of discharge, *not* the underlying conduct that led to the discharge," *Sierra Club*, 421 F.3d at 1143 (emphasis added), but Plaintiffs' theory of liability is wholly reliant on Defendants' "underlying conduct": they allege that Defendants are responsible because they caused the damage. As the case law makes clear, this allegation is insufficient. Defendants do not own the "leaky faucet," *id*. at 1145, and they are not the "current superintendent[s] of the discharge," *Huffman*, 625 F.3d at 167. Accordingly, on the facts alleged, the Court finds no basis to hold Defendants liable in an action under § 1365.

Plaintiffs have failed to state a claim under the CWA and the Court will grant Defendants' motion to dismiss the first, second and third claims for relief.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss in Lieu of Answer (*doc. 4*) is **GRANTED**. It is ORDERED as follows:

(1) The first, second, third, fifth, and sixth claims for relief in Plaintiffs' Civil Complaint (*doc. 1-1*) are **DISMISSED WITH PREJUDICE**;

(2) All other claims in Plaintiffs' Civil Complaint (*doc. 1-1*) are **DISMISSED WITHOUT PREJUDICE**; and

(3) Within **30 days** of the filing of this Order, Plaintiffs may file a motion for leave to amend the complaint.

**IT IS SO ORDERED.**

_____
GREGORY B. WORMUTH
CHIEF UNITED STATES MAGISTRATE JUDGE
**Presiding by Consent**